UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBORAH HAGERMAN,

                    Plaintiff,              CASE NO. 15-10952
                                            HON. DENISE PAGE HOOD
v.

MACOMB, COUNTY OF,
ANTHONY M. WICKERSHAM,
AMY FRANKS,
BRIAN PINGILLEY,
STEVEN MARSCHKE,
KEITH PETHKE,

                    Defendants.
_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND/OR DISMISSAL [#33],
DENYING DEFENDANTS' MOTION FOR LEAVE TO FILE NOTICE OF
NON-PARTY AT FAULT [#44], AND
SETTING DATES**

## I.    BACKGROUND

Plaintiff Deborah Hagerman ("Hagerman") is the personal representative of

Ryan Hagerman's Estate.  Hagerman filed this civil rights suit as result of the

brutal death of her son, at the hands of another inmate while detained in the

Macomb County Jail.  Defendants filed a Motion for Summary Judgment and/or

Dismissal.  (Doc # 33)  For the reasons set forth below, the Motion is Granted in

Part and Denied in Part.

On May 27, 2014, Warren Police Officers Stuart Krueger ("Krueger") and Frank Gasser ("Gasser") transported Ryan Hagerman to the Macomb County Jail for booking. During the intake process, he indicated that he was suicidal. (Doc # 33-5, Pg ID 240; Doc # 33-14, Pg ID 281) Ryan Hagerman was eventually classified as "High Observation – Green," which is the highest observation status at the jail, and placed in cell MH03 in the mental health unit. Defendants contend that, once notified of Ryan Hagerman's suicidal thoughts, they followed Macomb County Jail policy by properly classifying him, writing a report, and placing him in the mental health unit. (Doc # 33-14, Pg ID 281-82) Ryan Hagerman's mental health report did not indicate that he should be housed alone. (Doc # 33-17, Pg ID 290-91)

Also on May 27, 2014, Krueger and Gasser transported Mark Cowans ("Cowans") to the Macomb County Jail for booking. When Cowans arrived at Macomb County Jail he was in leg shackles. At his deposition, Krueger testified that leg shackles are used when prisoners are assaultive or considered a flight risk, and that having to use the leg shackles was "pretty rare" and happened with approximately "1 in 50" prisoners. (Doc # 38-2, Pg ID 491-92) Krueger testified that Cowans was in leg shackles because he had been assaultive to another prisoner and had tried to escape from his cell at the Warren Jail. Krueger further testified that Cowans had to be wrestled to the floor by a Michigan State Patrol trooper

2

while at the Warren Jail.  Krueger testified that upon arrival at the Macomb County Jail, he informed the Macomb County booking officers that Cowans was combative, had assaulted another prisoner, and had wrestled with a Michigan State Police trooper.  *Id.* at 493.  At his deposition, Gasser testified that he remembers that Krueger informed the Macomb County booking officers that Cowans was combative, had assaulted another prisoner, and had wrestled with a Michigan State Police trooper.  Doc # 38-3, Pg ID 512, 514-15; *see also* Doc # 38-4.  Defendant Deputy Steven Marschke ("Marschke"), on the other hand, testified that he remembers when Krueger and Gasser dropped off Ryan Hagerman and Cowans at Macomb County Jail, and that he was the first booking officer to receive them, but that Cowans was not in leg shackles and no information was conveyed about Cowans.  (Doc # 38-6, Pg ID 534, 536)  Defendant Deputy Keith Pethke ("Pethke") was also working in booking at the time and testified that the Warren Police Officers provided no information about Cowans.

During screening, Cowans did not report any medical or mental health problems.  He was initially placed in general population, but a few hours later Cowans indicated to Deputy Bradley Krueger that he felt suicidal.  Cowans was taken to the mental health unit for evaluation.  According to Defendants, Cowans' mental health report indicated that he felt suicidal, answered questions in a calm manner, and did not act aggressively, which failed to indicate that he was a danger

to anyone other than himself.  Defendants did not place Cowans on a status to be housed alone.

Cowans was also classified as "High Observation – Green" and placed in cell MH03 – the same mental health cell as Ryan Hagerman.  Mental health cells, such as MH03, are high observational units that are supposed to be monitored nearly continuously.  They contain cameras which give the mental health duty station desk a live feed of all activity that happens in the cells.  Cell MH03 cell is approximately ten feet away from the mental health duty station.

Ryan Hagerman and Cowans remained peacefully in the cell for 14 hours. On May 28, 2014, Cowans suddenly attacked Ryan Hagerman.  Cowans was on the bottom bunk and Ryan Hagerman was on the top bunk. Cowans pulled Ryan Hagerman's arm, causing him to fall from the top bunk to the concrete floor. Cowans punched Ryan Hagerman, and then proceeded to stomp on Ryan Hagerman's head.  Cowans occasionally stopped stomping on Ryan Hagerman's head, but only to look out the cell window into the hallway.  The attack lasted for approximately a minute and a half.

During the attack, Defendants Deputy Brian Pingilley ("Pingilley") and Deputy Amy Franks ("Franks") were in the mental health duty station.  Pingilley testified that he was on the intercom responding to another inmate, which prevented him from monitoring the activity in cell MH03.  Once he finished his

conversation, he sat down and resumed viewing the monitors.  He noticed, in the MH03 live feed, that Cowans was nudging Ryan Hagerman who was lying on the floor.  According to Pingilley, he asked Franks to hold off on completing her security round so that he could investigate the activity in cell MH03.  Pingilley entered the cell, and Franks initiated the intercom in the cell in order to communicate with Pingilley.  Pingilley asked Cowans what happened to Ryan Hagerman, and Cowans allegedly stated that he fell off his bunk.  Pingilley attended to Ryan Hagerman, and Franks called for medical assistance.

Ryan Hagerman was transported to the hospital where he died three weeks later as a result of the beating.  Macomb County Jail staff eventually viewed the video of the attack, and Cowans was convicted of Ryan Hagerman's murder.  Hagerman filed suit alleging three causes of action:  (1) Deliberate Indifference; (2) a *Monell* claim against Macomb County and Sheriff Anthony M. Wickersham; and (3) Gross Negligence.

## II.    STANDARD OF REVIEW

### A.    Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedures provides for a motion to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  This type of motion tests the legal sufficiency of the plaintiff's complaint.  *Davey v. Tomlinson*, 627 F. Supp. 1458, 1463 (E.D. Mich. 1986).

When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). A court, however, need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Gregory v. Shelby Cnty.*, 220 F.3d 443, 446 (6th Cir. 2000)). "[L]egal conclusions masquerading as factual allegations will not suffice." *Edison v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

As the Supreme Court has explained, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level… ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted); *see LULAC v. Bresdesen*, 500 F.3d 523, 527 (6th Cir. 2007). To survive dismissal, the plaintiff must offer sufficient factual allegations to make the asserted claim plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**B.     Motion for Summary Judgment**

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-57 (1986). A fact is material if it could affect the outcome of the case based on the governing substantive law. *Id*. at 248. A dispute about a material fact is genuine if, on review of the evidence, a reasonable jury could find in favor of the nonmoving party. *Id*.

The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the nonmoving party must "go beyond the pleadings and … designate specific facts showing that there is a genuine issue for trial." *Id*. at 324. The Court may grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc*., 328 F.3d 870, 873 (6th Cir. 2003). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Conclusory allegations do not create a genuine issue of material fact which precludes summary

judgment." *Johari v. Big Easy Restaurants, Inc*., 78 F. App'x 546, 548 (6th Cir. 2003).

When reviewing a summary judgment motion, the Court must view the evidence and all inferences drawn from it in the light most favorable to the nonmoving party. *Kochins v. Linden–Alimak, Inc*., 799 F.2d 1128, 1133 (6th Cir. 1986). The Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court's function at the summary judgment stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III.   ANALYSIS

### A. Qualified Immunity

Defendants contend that they are entitled to qualified immunity because Hagerman failed to establish a constitutional right, to be housed alone in a cell or continuously monitored in a cell, that was clearly established.

Qualified immunity protects state actors sued under Section 1983 from damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231(2009) (quotation marks omitted). The determination of whether a government official is entitled to qualified immunity is

a two-step inquiry: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Miller v. Sanilac Cnty.*, 606 F.3d 240, 247 (6th Cir.2010) (internal quotation marks and citations omitted). These steps may be addressed in any order. *Pearson*, 555 U.S. at 236.

The Court does not construe Hagerman's Fourteenth Amendment claims as narrowly as Defendants. Hagerman asserts a deliberate indifference claim regarding a inmate's right to be free from violence at the hands of his cellmate. That he was not housed alone and was not continuously monitored are two of the ways in which Ryan Hagerman's right to be free from violence at the hands of his cellmate was allegedly violated. The Court finds that Hagerman has asserted a constitutional claim on behalf of Ryan Hagerman. The right to be free from violence at the hands of other inmates was clearly established by the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825 (1994). *See Richko v. Wayne Cnty.*, 819 F.3d 907, 915 (6th Cir. 2016). Defendants are not entitled qualified immunity on the basis of failure to identify a clearly established constitutional right that was violated.

### B. Deliberate Indifference Claim

Hagerman claims that Defendants were deliberately indifferent to Ryan Hagerman's right to be free from a substantial risk of violence at the hands of another inmate.

Pretrial detainees are not protected under the Eighth Amendment; rather, the constitutional protections afforded to pretrial detainee stem from the Due Process Clause of the Fourteenth Amendment. *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985). *See also Bell v. Wolfish*, 441 U.S. 520, 545 (1979) ("pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners."). To the extent that Hagerman claims Eighth Amendment violations, those claims are dismissed because Ryan Hagerman was a pretrial detainee.

Prison officials may not remain deliberately indifferent to the risk of harm a prisoner may face at the hands of another prisoner. *Farmer*, 511 U.S. at 833 (1994). Prison officials have a duty to protect prisoners from violence committed by other prisoners. *Id.* Therefore, officials must take reasonable steps to "guarantee the safety of the inmates." *Id.* at 832.

To sustain a Section 1983 claim for deliberate indifference to a substantial risk of serious harm, the plaintiff must satisfy an objective and subjective component. The objective component requires a showing "that absent reasonable

precautions, an inmate is exposed to a substantial risk of serious harm." *Amick v. Ohio Dep't of Rehab. & Correction*, 521 F. App'x 354, 361 (6th Cir. 2013). The subjective component requires a showing that (1) the official being sued subjectively perceived facts from which to infer a substantial risk to the prisoner, (2) the official did in fact draw the inference, and (3) the official then disregarded that risk. *Richko*, 819 F.3d at 915. Because government officials do not readily admit the subjective element, a plaintiff may establish the subjective prong through inference from circumstantial evidence, "and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009). A court must examine the subjective component for each individual defendant. *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 541 (6th Cir. 2008).

Defendants do not challenge, and the Court finds that Hagerman has satisfied the objective component of her deliberate indifference claim. Viewing the evidence in the light most favorable to Hagerman, Cowans arrived at Macomb County Jail in shackles. The additional security restraint indicated that Cowans presented some type of danger to either himself or others. Krueger and Gasser told Marschke that Cowans was combative, had assaulted another prisoner, and had struggled with another police officer while attempting to flee custody at the Warren Jail. Ryan Hagerman was placed in a cell with Cowans, and he suffered a violent

attack at the hands of Cowans which resulted in Ryan Hagerman's death. The Court finds that Ryan Hagerman was incarcerated under conditions that posed a substantial risk of serious harm. Having found that the objective component of the deliberate indifference claim is sufficiently established at this stage, the Court turns to examining the subjective component as to each Defendant.

### 1. Defendant Marschke

Hagerman argues that Defendant Marschke was deliberately indifferent because Krueger informed Marschke that Cowans had assaulted another inmate and had wrestled with a Michigan State Police trooper prior to his arrival at the Macomb County Jail, and Marschke did nothing with that information. Defendants argue that the Court should grant Marschke qualified immunity and enter summary judgment in his favor because Marschke did not play a role in the decision to house Cowans and Ryan Hagerman together.

All of the officers, including Marschke, testified that if they had known that Cowans previously assaulted another inmate he would have been housed alone. Michelle Sanborn ("Sanborn"), Macomb County Jail administrator and author of the jail policies and procedures, testified that if police officers drop off an inmate at the jail and warn that an inmate is assaultive, then that inmate should not be housed with other inmates, and the booking officer should note this information in the computer system so that everyone is aware. (Doc # 38-15, Pg ID 700, 702) Such

an inmate would be designated as "High Risk Assault" and would be segregated from the rest of the population. *Id.* at 702. Krueger and Gasser testified that Krueger informed the Macomb County booking officers during hand-off that Cowans was combative, had assaulted another inmate, and had wrestled with a Michigan State Police trooper while at the Warren Jail.

Viewing the evidence in the light most favorable to Hagerman, there is a question of material fact regarding whether Krueger informed Marschke that Cowans had attacked another inmate, and Marschke failed to communicate this information to his fellow officers who were responsible for assigning Cowans to a cell. Under those circumstances, the Court concludes that a reasonable juror could find that Marschke was deliberately indifferent to the safety of whoever was to be housed in a cell with Cowans. Marschke is not entitled to qualified immunity. The Court denies Defendants' Motion for Summary Judgment as to the deliberate indifference claim against Marschke.

### 2.     Defendant Pethke

Hagerman argues that Defendant Pethke was deliberately indifferent because Krueger informed Pethke that Cowans had assaulted another inmate and had wrestled with a Michigan State Police trooper prior to his arrival at the Macomb County Jail, and Pethke did nothing with that information. Defendants argue that the Court should grant Pethke qualified immunity and enter summary judgment in

13

his favor because Pethke was not aware that Ryan Hagerman and Cowans were housed together, and he did not make the decision to house them together.

Pethke was working in the booking area on May 27, 2014 upon the arrival of Ryan Hagerman and Cowans to the Macomb County Jail. (Doc # 38-7, Pg ID 545) He was working in booking along with Marschke, and Deputies Bradley Krueger, Jennifer Bancroft, and Jake Thorne. *Id.* at 546. Pethke testified that he was present for all of the conversations that Warren Police Officers Stuart Krueger and Gasser had with the booking officers when they dropped off inmates on that day. *Id.* at 549. Krueger testified that he told the booking officers "at the window" that Cowans had assaulted another inmate. (Doc # 38-2, Pg ID 493) Pethke testified that he was working "up at the front window" on that day when the Warren officers came in. (Doc # 38-7, Pg ID 549)

Pethke performed Ryan Hagerman's initial screening and learned that he was suicidal. *Id.* at 555. Pethke changed Ryan Hagerman into an anti-suicide gown and placed him in a high-observation detox cell until he could be booked and housed in a mental health unit cell. *Id.* Pethke did not pat down or screen Cowans. *Id.* at 546. A few hours after Cowans' initial intake, while he was still in a holding cell, Pethke became aware that Cowans made some comments to Pethke's partner which suggested that he should be under high observation. *Id.* at 547.

14

After the assault, on June 2, 2014, Krueger went back to the Macomb County Jail and told Pethke that he had informed the Macomb County Jail booking officers that Cowans was assaultive toward another inmate while at the Warren Jail. *Id.* at 549. Pethke asked Krueger who he told specifically. Krueger and Gasser thought Krueger had told both Pethke and Marschke about Cowans. *Id.* at 549, 551-52. Pethke subsequently omitted himself in writing a report about this conversation. Pethke wrote that Krueger told him that he told only Marschke about Cowans on May 27, 2014. *Id.* at 549.

The same reasoning discussed above for Marschke applies. Viewing the evidence in the light most favorable to Hagerman, there is a question of material fact regarding whether Krueger informed Pethke that Cowans had attacked another inmate, and Pethke failed to communicate this information to his fellow officers who were responsible for assigning Cowans to a cell. Under those circumstances, the Court concludes that a reasonable juror could find that Pethke was deliberately indifferent to the safety of whoever was to be housed in a cell with Cowans. Pethke is not entitled to qualified immunity. The Court denies Defendants' Motion for Summary Judgment as to the deliberate indifference claim against Pethke.

### 3. Defendant Pingilley

Hagerman argues that Defendant Pingilley was deliberately indifferent in knowingly turning his back on the high-observation monitors to speak on the

15

intercom for approximately two minutes without requesting assistance from Deputy Franks, who was nearby, to watch the monitors while Pingilley was turned away. Defendants argue that the Court should grant Pingilley qualified immunity and enter summary judgment in his favor because the only information that Pingilley knew about Cowans and Ryan Hagerman was that they were in a high-observation cell wearing green anti-suicide gowns.

On the day of the assault, Pingilley was assigned as the day shift mental health runner, and it was his responsibility to make the hourly security rounds in the mental health unit. (Doc # 38-12, Pg ID 634-35) Ryan Hagerman and Cowans had been housed together before Pingilley's shift began, and Pingilley did not know why they were housed in cell MH03, a high-observation cell. *Id.* at 640, 642. Pingilley testified that he did not know that Cowans had a history of being assaultive. *Id.* at 644.

Ryan Hagerman and Cowans were classified as high-observation green inmates, which was the highest observation status at the jail. (Doc #38-14, Pg ID 689; Doc # 38-15, Pg ID 707) Sanborn testified that, per the jail policy, high-observation inmates are supposed to be observed "nearly as continuous as physically possible . . . because they need the highest level of supervision because they're in crisis." (Doc # 38-15, Pg ID 707-08) She testified that some high-observation inmates can pose serious threats to other inmates. *Id.* at 708. Officer

16

Rossman testified that failure to watch the monitors for high-observation inmates in the mental health duty station could lead to significant harm to one of the inmates or an inmate who was with another inmate.  (Doc #38-14, Pg ID 689)

At the precise time of the assault, Pingilley was allegedly speaking on the mental health duty station intercom, responding to the needs of another inmate. Rossman testified that if an officer is assigned to watch the high-observation monitors but gets called away, it is the officer's responsibility to make sure there's another officer there who can watch the monitors.  (Doc # 38-14, Pg ID 689) Deputy Franks was also in the mental health duty station at the time of the assault and Pingilley's intercom conversation.  Franks testified that she observed Pingilley talking on the intercom, and that his conversation lasted for one to two minutes. (Doc # 38-13, 674)  Pingilley testified that Franks sits about 15 feet away from him in the same duty station.  (Doc # 38-12, Pg ID 648)

Rossman testified that she has had to talk on the intercom while at the mental health duty station.  *Id.*  She testified that she could not see the monitors while talking on the intercom, but that she was still able to look into the cells, and into cell MH03 in particular, through the windows.  *Id.* at 689-90.  Rossman testified that if an officer is on the intercom and sees an altercation happening through one of the high-observation cell windows, the officer is supposed to discontinue the intercom conversation and go into the cell immediately to stop the

17

altercation.  (Doc # 38-14, Pg ID 690)  Pingilley testified that the mental health cells have an upper and lower window; the middle of the upper window is at eye height.  (Doc # 38-12, Pg ID 636)  He testified that when standing at the mental health unit duty station, he can see 70 percent of cell MH03, including the bunks and the floor in front of the bunks where Ryan Hagerman was found on the floor. *Id.* at 643.  Cell MH03 is ten feet away from Pingilley's desk in the duty station. (Doc # 38-12, Pg ID 648)  Pingilley further testified that, while inside the mental health duty station, he is able to hear yells and loud bangs coming from inside the cells.  *Id.* at 645-46.  Franks also testified that the mental health cells are not sound proof and that, while inside the mental health duty station, she is able to hear yelling that occurs inside the cells.  (Doc # 38-13, Pg ID 674)

According to Pingilley, he first became aware of the assault after it was over, after he finished his intercom conversation and sat at his desk.  At that point, Pingilley saw on the monitor that Cowans was nudging Ryan Hagerman who was on the floor.  Pingilley then asked Franks to hold off on making her next security round so that he could go to cell MH03 to investigate.  Pingilley entered the cell and asked Franks to call the nursing staff, which she did using her prep radio.

At his deposition, Pingilley admitted that he did not know whether he complied with the Macomb County Jail policy requiring nearly continuous monitoring of the high-observation inmates.  Doc # 38-12, Pg ID 655-56; *see also*

Doc # 38-19, Pg ID 733.  He testified that he did not know and never asked what "nearly continuous" meant.  He further testified that he thought he only needed to observe high-observation inmates once every 15 minutes, and that this was his actual practice.  (Doc # 33-12, Pg ID 636, 640, 647)

Viewing the evidence in the light most favorable to Hagerman, Pingilley knew that Ryan Hagerman and Cowans were high-observation green inmates, the highest observation status at the jail that is reserved for inmates who are in crisis. He knew they could be a danger to themselves or to others.  He knew that failure to monitor them on a nearly continuous basis could lead to significant harm to one or both of them.  Nevertheless, he did not monitor Ryan Hagerman and Cowans on a nearly continuous basis as required.  Instead, he observed them once every fifteen minutes.  Pingilley then proceeded to talk on the intercom for two minutes without asking Franks, who was sitting a few feet away in the same duty station, to watch the high-observation monitors.  Further, there is evidence that Pingilley could actually see inside cell MH03 while speaking on the intercom and would have been able to hear yelling coming from the mental health cells inside his duty station. Viewing the evidence in the light most favorable to Hagerman, there is a question of material fact regarding whether Pingilley saw and/or heard the assault while speaking on the intercom, and failed to discontinue his conversation to attempt to stop the assault.  The Court concludes that a reasonable juror could find that

Pingilley was deliberately indifferent to the safety of Ryan Hagerman.  Pingilley is not entitled to qualified immunity.  The Court denies Defendants' Motion for Summary Judgment as to the deliberate indifference claim against Pingilley.

### 4.   Defendant Franks

Hagerman argues that Defendant Franks was deliberately indifferent in watching as Pingilley turned away from the monitors and carried out a two-minute conversation on the intercom while doing nothing to assist in monitoring the high-observation cells, in contravention of her training and custom.  Defendants argue that the Court should grant Franks qualified immunity and enter summary judgment in her favor because her duties did not include the mental health unit, she could not see the mental health cells, and she had not interacted with Cowans or received any information about him prior to the assault.

On the day the assault, Franks was assigned as the Upper D Block runner responsible for female inmates.  (Doc # 33-28, Pg ID 354-55)  Her duties did not include the mental health unit that housed Ryan Hagerman and Cowans, and she could not see the mental health cells from her desk.  *Id.* at 357, 371.  However, Franks testified that her desk is within the mental health duty station, and was approximately 15 feet away from Pingilley's desk.  Doc # 38-13, Pg ID 663; Doc # 38-12, Pg ID 648; *see also* Doc # 38-20.

At the time of the assault, Franks was watching Pingilley as he talked on the intercom for approximately two minutes. She testified that she was looking right at him because she wasn't doing anything. (Doc # 38-13, Pg ID 674) Franks also testified that the mental health cells are not sound proof and that, while inside the mental health duty station, she is able to hear yelling that occurs inside the cells.

According to Franks, she first became aware of the assault after it was over, after Pingilley made her aware of the problem in cell MH03 and asked her to hold off on her security round. (Doc # 33-28, Pg ID 363-64) Franks assisted Pingilley via the intercom system and called nursing staff over her prep radio. *Id.* at 369, 372-73. She remained in the mental health duty station until she was relieved by another officer so that she could make her security round. (Doc # 33-35, Pg ID 417)

Viewing the evidence in the light most favorable to Hagerman, Franks knew that Ryan Hagerman and Cowans were high-observation green inmates, the highest observation status at the jail that is reserved for inmates who are in crisis. She knew they could be a danger to themselves or to others. She knew that failure to monitor them on a nearly continuous basis could lead to significant harm to one or both of them. There is a question of material fact regarding whether she failed to do anything to assist in monitoring the high-observation cells while she simply sat watching Pingilley have a two-minute conversation on the intercom, despite her

testimony that she was doing nothing else at the time.  Viewing the evidence in the light most favorable to Hagerman, there is a question of material fact regarding whether Franks could hear the assault taking place in cell MH03, which was a mere ten feet away from the duty station and not sound proof, and failed to get up to look at the high-observation monitors during the minute and a half that Cowans spent brutally punching and stomping on Ryan Hagerman.  The Court concludes that a reasonable juror could find that Franks was deliberately indifferent to the safety of Ryan Hagerman.  Franks is not entitled to qualified immunity.  The Court denies Defendants' Motion for Summary Judgment as to the deliberate indifference claim against Franks.

### 5.      Defendant Wickersham

Defendant Sheriff Anthony M. Wickersham ("Wickersham") argues that the deliberate indifference claim against him must be dismissed because he did not have personal contact with Ryan Hagerman or Cowans, and did not participate in their screening, booking, or housing.  Hagerman clarifies in her Response that Count I of the Complaint does not apply to Wickersham.  Rather, Hagerman asserts that Wickersham is liable for deliberate indifference as a municipal actor.  Accordingly, any deliberate indifference claim against Wickersham in an individual capacity is dismissed.

### C. Causation

Defendants next argue that all Section 1983 claims against all Defendants should be dismissed because two separate intervening acts—premeditated murder by Cowans and a health assessment of Cowans by a trained mental health professional 55 minutes before the assault—have broken the causal connection to the alleged wrongdoing.

Hagerman responds, and the Court agrees, that the very existence of a deliberate indifference cause of action, first recognized by the Supreme Court in *Farmer*, shows that Defendants' argument is meritless.  As the Supreme Court has explained,

> [p]rison officials have a duty to protect prisoners from violence at the hands of other prisoners. . . .  Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, . . . having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course. . . . [A] prison official violates the Eight Amendment only when two requirements are met.   First, the deprivation alleged must be, objectively, "sufficiently serious." . . .   [Second, the official must] know[] of and disregard[] an excessive risk to inmate health or safety.

*Farmer*, 511 U.S. at 833-34, 837.

Having determined that Hagerman has established the objective component of the deliberate indifference test, and having determined that there remain genuine issues of material fact as to the subjective component, the Court denies

Defendants' Motion for Summary Judgment as to the deliberate indifference claim against Marschke, Pethke, Pingilley, and Franks.

### D.    Fourth Amendment Claim

Defendants argue, and the Court agrees, that the Complaint is devoid of any facts that support an allegation that Defendants unreasonably searched, seized, or used excessive force against Ryan Hagerman.  Hagerman clarifies in her Response that she does not assert a separate count under the Fourth Amendment.  Hagerman acknowledges that the Sixth Circuit has explained that a deliberate indifference claim asserted on behalf of a pre-trial detainee is properly analyzed under the Due Process Clause of the Fourteenth Amendment.  *See Phillips*, 534 F.3d at 539. Accordingly, to the extent that Hagerman claims Fourth Amendment violations, those claims are dismissed because Ryan Hagerman was a pretrial detainee.

### E.    Municipal Liability Claim

Hagerman argues that the driving force of Defendants' deliberate indifference toward Ryan Hagerman's safety while in their custody was Macomb County and Wickersham's failure to adequately train and supervise jail employees. Hagerman further argues that Macomb County and Wickersham ratified the unconstitutional behavior by failing to discipline the wrong-doers.  Defendants argue that there is no credible evidence to support a municipal liability claim.

A plaintiff asserting a Section 1983 claim under *Monell* "must demonstrate that the alleged federal violation occurred because of a municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  A plaintiff must show that his constitutional rights were violated and that a policy or custom of the county was the "moving force" behind the deprivation of his rights.  *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254-55 (6th Cir. 2010).  Accordingly, a plaintiff must demonstrate one of the following:  (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.  *Burgess*, 735 F.3d at 478.

Hagerman first asserts that Macomb County and Wickersham failed to adequately train and supervise jail employees.  A failure-to-train claim "requires a showing of prior instances of unconstitutional conduct demonstrating that the municipality had ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury."  *Id.* (internal quotations omitted).  Hagerman next asserts that Macomb County and Wickersham ratified unconstitutional behavior.  "[A] custom-of-tolerance claim

requires a showing that there was a pattern of inadequately investigating similar claims." *Id.*

A review of the record shows that Hagerman has not set forth evidence that there were prior instances of similar misconduct so as to show that Macomb County and Wickersham were on notice that the training and supervision of jail employees with respect to booking and housing of assaultive inmates or monitoring of high-observation inmates was deficient. Similarly, Hagerman has not shown the existence of any prior instances of a failure to investigate claims of deliberate indifference to an inmate's right to be free from violence at the hands of his cellmate. Accordingly, the Court grants Defendants' Motion for Summary Judgment as to the municipal liability claim against Macomb County and Wickersham.

### F.    Gross Negligence Claim

Gross negligence is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(7)(a). It suggests "a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." *Tarlea v. Crabtree*, 263 Mich. App. 80, 90 (2004). Simply alleging that an actor could have done more or that a defendant could have taken extra precautions is insufficient under Michigan law to sustain a claim of gross negligence. *Id.* Rather, a plaintiff must demonstrate that an

objective observer could reasonably conclude that the actor simply did not care about the safety or welfare of those in his charge. *Id.*

Furthermore, the plaintiff must show that the alleged misconduct was "the proximate cause" of the injuries. *Robinson v. City of Detroit*, 462 Mich. 439, 462 (2000). This means a plaintiff must show that the misconduct was the most immediate, efficient, and direct cause of the plaintiff's injuries. *Id.*

Hagerman has failed to show that Defendants' conduct was the proximate cause of Ryan Hagerman's death. Even taking the evidence in the light most favorable to Hagerman, there is no evidence establishing that Defendants' acts were "the one most immediate, efficient, and direct cause preceding [Ryan Hagerman's] injury." *Id.* It was Cowans who administered the brutal beating that ultimately led to Ryan Hagerman's death. Accordingly, Hagerman has not established that Defendants were grossly negligent. *See also, Dean v. Childs*, 474 Mich. 914 (2005) (reversing lower court's denial of summary disposition regarding the alleged gross negligence of firefighters responding to a house fire by noting that "the" proximate cause of the deaths of the decedents was the fire itself, not the defendants' actions in response to the fire). Summary judgment is granted in favor of Defendants as to the gross negligence claim.

**IV.    Defendants' Motion for Leave to File Notice of Non-Party at Fault**

On June 16, 2016, Defendants filed a Motion for Leave to File Notice of Non-Party at Fault against the City of Warren and its Police Officers Krueger, Gasser, Scott, Howlett, and VanderLinder.  (Doc # 44)  Defendants argue that, although they did not file this Motion within 91 days after filing their first responsive pleading, the Court should allow the filing of this late Notice because Defendants could not with reasonable diligence have known the extent of the non-parties' involvement in preparing Cowans' jail detention card.  Defendants further assert that Hagerman will not be prejudiced by the late Notice because she has already obtained the depositions of Krueger and Gasser, and any information that Scott, Howlett, and/or VanderLinder may have is limited to the preparation of Cowans' jail detention card.

Hagerman filed a Response opposing the Motion.  (Doc # 47)  Hagerman argues that Defendants do not meet the requirements for a late filing of a Notice of Non-Party at Fault because they were in possession of the facts which form the basis of their Motion at the time they filed their first responsive pleading in April 2015, and because the late filing will result in unfair prejudice to Hagerman.

Michigan Court Rule 2.112(K) provides a mechanism by which a defendant can give "notice of a claim that a nonparty is wholly or partially at fault," and

applies in federal court.  *See Greenwich Ins. Co. v. Hogan*, 351 F. Supp. 2d 736,

738-40 (W.D. Mich. 2004).

> The notice must be filed within 91 days after the party files its first responsive pleading.  On motion, the court shall allow a later filing of the notice on a showing that the facts on which the notice is based were not and could not with reasonable diligence have been known to the moving party earlier, provided that the late filing of the notice does not result in unfair prejudice to the opposing party.

Mich. Ct. R. 2.112(K)(3)(c).

At the time of Cowans' transport from Warren to Macomb, Warren Police

Officers Krueger and Gasser gave Cowans' jail detention card to the booking

officers at the Macomb County Jail.  The jail detention card was signed by Gasser,

and it was incomplete.  It omitted answers to several questions, including the

question, "Is the prisoner assaultive?"  Defendants claim that they could not have

known with reasonable diligence that Cowans' jail detention card was not prepared

by Gasser or Krueger until Krueger's deposition on March 21, 2016.  At his

deposition, Krueger testified that it was possible that Warren lock-up officers

Scott, Howlett, and/or VanderLinder may have played a role in the incident by not

properly completing Cowans' jail detention card.

The Court finds that the facts on which Defendants' Motion for Leave to

File Notice of Non-Party at Fault is based could with reasonable diligence have

been known to Defendants earlier.  Hagerman notes that Defendants have been in

possession of the incomplete jail detention card since the outset of this litigation.  It

has been part of the Macomb County Jail records since the assault on Ryan

Hagerman, and it is attached to Defendants' dispositive Motion filed in April 2016.

Even if Krueger provided new information about the preparation of the jail

detention card in March 2016, it does not explain why Defendants could not have

filed a timely Notice of Non-Party at Fault naming the City of Warren, Krueger,

and/or Gasser.  It also does not explain why Defendants waited almost three

months after Krueger's deposition, and over two months after the filing of their

dispositive Motion to file this Motion for Leave to File Notice of Non-Party at

Fault.  The Court further notes that it was Hagerman who noticed the depositions

of Krueger and Gasser in March 2016, a step that Defendants could have taken

earlier.  Defendants do not appear to have taken steps to discover the identities of

the Warren officers who prepared the jail detention card, despite being in

possession of the card since Cowans' arrival at the Macomb County Jail, despite

Krueger returning to Macomb County Jail and informing Marschke and Pethke that

Warren officers knew that Cowans had previously been assaultive while at the

Warren Jail (a conversation that was documented in a report written by Pethke in

June 2014), and despite the Complaint alleging that Krueger informed Marschke

that Cowans was assaultive toward another inmate while at the Warren Jail.  The

Court concludes that Defendants were not reasonably diligent and did not

independently investigate their potential defense that Warren officers inadequately completed Cowans' jail detention card by failing to note his assaultive history.

The Court also finds that such a late filing of a Notice of Non-Party at Fault would result in unfair prejudice to Hagerman. This action had been pending for over a year and three months by the time Defendants filed their Motion for Leave to File Notice of Non-Party at Fault in mid-June 2016. By that time, discovery had closed, the dispositive motion cut-off date had passed, and Defendants' dispositive Motion had been fully briefed and heard and was under advisement. Hagerman asserts that, had Defendants filed a timely Notice, Hagerman would have taken additional depositions and planned her questioning from a different strategic perspective. If the Court were to allow this late Notice, Hagerman asserts that she would be compelled to add the City of Warren and the named Warren Police Officers as Defendants, the new defendants would likely want to re-depose the Macomb Officers, and the case would be forced back to square one. Hagerman asserts, and the Court agrees, that the additional costs and significant delay would result in unfair prejudice to Hagerman.

The Court concludes that Defendants have failed to meet the requirements for a late filing of a Notice of Non-Party at Fault. The Court denies Defendants' Motion for Leave to File Notice of Non-Party at Fault.

## V.   CONCLUSION

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment and/or Dismissal (Doc # 33) is DENIED IN PART as to the deliberate indifference claim against Defendants Steven Marschke, Keith Pethke, Brian Pingilley, and Amy Franks.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment and/or Dismissal (Doc # 33) is GRANTED IN PART as to the deliberate indifference claim against Defendant Anthony M. Wickersham in an individual capacity, any Eighth Amendment claim, any Fourth amendment claim, the municipal liability claim against Macomb County and Anthony M. Wickersham, and the gross negligence claim against all Defendants.

IT IS FURTHER ORDERED that Defendants Macomb County and Anthony M. Wickersham are DISMISSED from this action.  Defendants Steven Marschke, Keith Pethke, Brian Pingilley, and Amy Franks remain.

IT IS FURTHER ORDERED that Defendants' Motion for Leave to File Notice of Non-Party at Fault (Doc # 44) is DENIED.

IT IS FURTHER ORDERED that this matter is set for a Final Pretrial Conference on May 30, 2017 at 2:30 p.m..  All parties with authority to settle must

appear at the conference.   The Proposed Joint Final Pretrial Order under Local

Rule 16.2 must be submitted by May 23, 2017.

IT IS FURTHER ORDERED that the jury trial is set for June 20, 2017 at

9:00 a.m..

S/Denise Page Hood
Denise Page Hood
Chief Judge, United States District Court

Dated:  March 29, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of
record on March 29, 2017, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager